Good afternoon and welcome to San Francisco. I know you all are here from Idaho. It's nice to have you here. And it's nice to be here in San Francisco today. I just wanted to welcome you. And then also just wanted to check in with Judge Pregerson to make sure he is on the phone and that he can hear us. Judge Pregerson, are you there? I'm here. Okay, great. And then I think we're ready to proceed. So please come forward. May it please the Court. My name is Elisa Massoff and I represent Petitioner Appellant Lanny Smith. I would like to reserve five minutes for rebuttal and I will watch the clock. I will first argue the certified expert rebuttal issue and follow with the uncertified issues of fundraising, discovery, due process and cumulative error. Trial counsel was ineffective for failing to rebut the testimony of Eric Greenwade with expert witness Fox who could not refute the digital warp imaging testimony. The district court's fact finding on this issue was an abuse of discretion and clearly erroneous. It was not a strategic decision to use only Richard Fox and rely on cross-examination of Greenwade. Fox did not understand the techniques used by Greenwade. He testified, quote, he didn't challenge it and he took Greenwade at his, quote, scientific word. Could I interrupt you, counsel? Forgive me. Your time is ticking. So here's my question on this claim. I understand that you think this was not a reasonable strategic choice and your brief is very clear about that. And you argue, though, that what he should have done is hire a different expert, Bodsniak. I'm not sure if I'm pronouncing that correctly. Is that right? Your Honor, my argument is not that it had to be Bodsniak, but that it had to be someone who could have gone head-to-head with the digital warp imaging testimony. And that would not be, that's my question, because that would not be Bodsniak, because he was a shoe impression guy. And this person quite clearly wasn't an expert on shoe impression testimony, right? He was an expert on the digital warping technology. I agree with that assessment, Your Honor. And my argument is not that it had to be Bodsniak, but that the decision to not have someone who could refute that digital warp imaging testimony head-to-head, that's where the ineffective assistance of counsel came in. Okay, so it's not Bodsniak, because that's not his area either. He was not a digital photograph warper guy, right? It's my understanding that Bodsniak could probably provide some, and this is based on my consultation with Bodsniak, and there's a declaration of him. He's a foot impression expert. And whether or not he could assess what that digital warping imagery is and then provide some guidance on who that person might be, I don't know. But I would agree that that had to be rebutted with someone who could go head-to-head with digital warp imaging. Okay, so you mean you think it was IAC for defense counsel to not have somebody who could opine in the area that was really Greenwade's area of expertise? Correct. You're saying that this expert was a general forensic expert and not a specialized expert, and therefore the counsel was ineffective? It goes beyond that, Your Honor. So Mr. Fox was definitely a criminologist who was kind of, I guess, a jack of all trades. But in addition to being able to address the specifics of the foot impression expert, the defense needed someone who could understand and help the defense understand what Greenwade was saying and break it down for purposes of cross-examination and be able to take the stand and rebut. So it's our position that an expert witness provides two facets when you're consulting with them. They assist counsel in knowing what is the testimony that's being proffered and the methodology, and then have the ability as well to take the stand and testify against it head-to-head. Okay, but if that's your argument, then it seems to me there's another problem, which is I can't tell from this record that any such expert existed who would have contradicted Greenwade. Well, therein lies the problem, and that is that the defense recognized that they needed that expert and, in fact, brought a motion in limine prior to trial, and that's in the state's record, Volume 8, I believe, Excerpts of Record 13, where the defense had a motion in limine to exclude Greenwade, and it was about a couple of weeks before trial, and they said that they needed to find someone head-to-head. They had knowledge that Greenwade existed from at least November of the previous year, and this was in March, and the judge at that time was recommending that they find someone either from INEL, where Greenwade was from, or perhaps a retired teacher. In the argument in the motion in limine, the judge was suggesting the defense had time, given that they knew. Counsel, I know that. I've read that. And so here's the problem, if you can focus on this part. I fully appreciate that the lawyer had to make an argument about his strategy and his tactics and prioritizing his resources, and you do too, so I don't want to lecture you about that. But isn't the problem on this claim that if we don't know that such an expert existed who actually would have disagreed with Greenwade, then I'm not sure how your IAC claim can hold up? If the district court had provided me with funding to be able to look into this very issue, then I would be able to answer that question, but that goes into the second issue that I want to argue today, which is the uncertified claim, which is the district court denied me the ability to conduct that discovery and get funding to look at that. I asked for funding to start with BODSIAC as a place to figure out what this testimony was so that I could figure out if there's such thing as a digital warp imaging expert. I was never allowed to explore that on behalf of Lanny Smith because the district court denied the discovery and denied the funding to do that. In order to fully develop his claims, Lanny Smith should be given that opportunity. In fact, going on along this issue of denial of discovery, in the court's initial 2009 order when I was appointed, the court recognized that Lanny Smith had valid, cognizable, non-frivolous claims related to Brady, impeachment, and ineffective assistance of counsel, and went so far as to direct both counsel for the state and myself to see if we could agree on discovery. When we couldn't, the court approved some, and that led me to two depositions where I then figured out that no forensic testing had been done and Victor Rodriguez had what he asserted to be files that he kept himself. Beyond that, I was denied the ability for Mr. Smith to engage in more full discovery or have any funding. So I would be able to answer your question, Your Honor, on point, if I had been allowed to fully develop that claim. And it's our position that Mr. Smith has provided, Lanny has provided the good cause to allow that discovery to take place and for that funding to take place because we need both in order to proceed. We need permission to conduct the discovery and then funding to be able to consult with experts. I wanted to ask you questions regarding your due process claims because those are somewhat interesting. And I wanted to find out what the current posture, in your view, is in terms of any hurdles you might need to overcome to be successful on them. You know, apparently the trial court allowed Mr. Greenway, we were talking about him a little bit, to testify about the shoe print evidence, even though he was not a shoe print expert in the testimony, likely, as you assert, prejudiced the petitioner here. So what happened below? Was this raised in a state direct appeal? The due process claim it was, and that's in state's excerpts of record, the supplemental record. They provided the state's brief. So there's no Daubert claim raised, right? There's a very general due process claim, is that what you're referring to? It is a due process claim, a general due process claim, Your Honor, yes. But it's our position that that was preserved below. It was definitely preserved at the trial level. And then trial counsel was also appellate counsel, and trial counsel raised that in his appellate brief. And was it raised in the state collateral proceeding, conviction proceeding? The ineffective assistance of counsel, due process itself was not raised in post-conviction. Ineffective assistance of counsel and Brady claims were raised in post-conviction. In post-conviction, the ineffective assistance of counsel was summarily dismissed, and the Brady claim on Jamie Hill was the one that moved forward. So what does that mean now, then? Can you overcome that at this point? The way that I can overcome that is with excuse for procedural default under the Shloop gateway of manifest injustice. And if I was allowed discovery, the way that I would proceed on that would be twofold. One would be to consult with Bodziak to establish that it was not the proper science at the time for the court to have allowed the jury to hear Greenwade's testimony in the form of shoe impression evidence, and then also to address that evidence head-to-head to establish that it was a due process violation for the judge to, the trial court judge, not to have engaged in his gatekeeping function to keep that evidence from coming before the jury. Because he was the wrong expert or because the science wasn't sufficiently developed? I think that it is both of those. First of all, at the trial court level, they did raise that it was not necessarily, it might have been scientific. There was nothing that was coming before the court that that was peer-reviewed. There was definitely nothing that was coming before the court that that amounted to the type of evidence that should have been allowed to do a one-to-one match, essentially. It had never been used that way before, so the record's pretty clear on that one. Right, correct. And so I think it's twofold. And so the posture is the same with respect to the excluded evidence of Jeff Smith's past bad acts, the newly discovered past bad acts, or just the ones in general. But is that the same posture? It was raised on direct appeal but not on the state post-conviction relief? Jeff's bad acts, prior bad acts, could have been developed on ineffective assistance of counsel at the post-conviction level. But that was never allowed to be developed. And that's something that the district court, in this case, did acknowledge that there were procedural bars that the state continually used to try to stop the development there. So it was not developed in post-conviction because it was summarily dismissed. So, again, the due process claim, as it relates, there is another Schlute Manifest Injustice Gateway. And then if I could talk to you about your Brady claims, because these ones that were raised after the remand, I'm just trying to figure out, there's a lot of confusion, or I guess not just confusion, it's disputed as to whether or not you all had access to that. Or I say you all, Mr. Smith had access to that at some point, and I'm trying to figure out whose burden it is to show that it actually was suppressed. It seems like it falls on you. So, for example, the property record evidence about Mr. Jeff Smith's shoe size. Do you bear the burden to establish that the state did not disclose this information prior to trial and that the information was prejudicial and also material? It's Mr. Smith's position that the burden to comply with Brady is the state's. What's your authority on that? I mean, it seems like I know there is a burden. Well, I don't want to interrupt you. Let me have you finish that, and then I'll ask you a question. In terms of being able for you to analyze that as a court, you need to understand how it is that Mr. Smith claims he didn't have access to that information at all. And there are several components that establish that and that it wasn't actually provided. One is the affidavit, the declaration that was included with the second amended petition that showed the information and attachments that were disclosed in Rodriguez's materials. And the other piece that the court can glean from is that throughout the trial proceedings, had this evidence been available to the defense, it would have been brought up in the form of cross-examination of Jeff Smith or in Detective Rodriguez. So if there is a burden that shifts to Mr. Smith regarding that evidence, it's our position that we've met that burden by establishing that we didn't have it. There's not actions taken on behalf of the defense attorneys that show that they had that evidence, and it's attached to the second amended petition, indicating that it's evidence that the defense did not have access to. Counsel, if we could back up. Your brief cited Price as the case authority about this shifting burden that you're just alluding to now. Price and Lopez, those are our cases that talk about your burden, I think, which is Judge McGee's point, to raise at least an inference that you didn't have those materials, and then the burden shifts to the state to indicate otherwise. So to just back up, the declaration you're talking about, I want to make sure I'm looking at the same declaration, because I don't recall it being attached to the second amended complaint. Is that where I saw it? It's actually one where you're requesting more time. It's your declaration. It is my declaration. I think you were requesting more time, and you're saying there's this huge volume, and I'm looking through everything, and that it appears that much of this has not been produced thus far. Is that the only declaration? That is the only declaration, but it was attached also to the second amended petition with the information under the Brady claim. Okay. So in that declaration, so I have that, and I think I'm struggling with the same thing Judge McGee is struggling with, which is exactly what is it that is new or different that you think wasn't produced earlier. And that is in the second amended petition. There's a whole list of exhibits and reports, and those are in excerpts of record volume two that are submitted. And there's an affidavit there from you or somebody saying that you never got this? There is an affidavit, yes. Saying exactly that, that each of these items you never received. Yes, yes. Give me the ER site to that. The excerpts of record with all of the documents are in excerpts of record two, and the affidavit, if it's not attached to the second amended petition, is in a different excerpt of record. But my affidavit is attached in the excerpts of record. And you said you – The excerpt of record two, which has the second amended petition, lists the variety of reports that were new, and it's under the Brady claim in the second amended petition. That were new and that you're also attesting that you never had those previous. Correct. And nobody else did. Correct. Okay. Do you want to reserve the rest of your time? I do. Thank you, Your Honor. Thank you. That the client is – I'm sorry. That Detective Rodriguez – I'm sorry. That may have also the evidence that working on the shoes to make it look like that Lanny wore those shoes. Is that right? Judge, are you asking me about the new Brady materials? Yes. Yes. The new Brady materials, Detective Rodriguez, there are his initials marking out the size to make a correction to fit the evidence so that it looks like those shoes belong to Lanny Smith. And what's your evidence on that? That is the attachment in the second amended petition on the Brady materials where Victor Rodriguez has it colored. It's a pink log sheet, and he marked out the size with his initials and changed the size on the sheet. And then the additional evidence that supports that is that Detective Al Thompson had originally put in that that was a different size, the size being 8 1⁄2, and he subsequently did a report that said that he had made a mistake and that it was actually 9 1⁄2. Detective Thompson did.  And that was known at the time of trial. The Detective Thompson's note was known at the time of trial. Detective Thompson's was, but Detective Rodriguez's was not. Right. Thank you. I have the declaration starting at 2 ER 289, so maybe you can just confirm that before you come back up. Were these claims exhausted in state court? I'm sorry. I'm sorry. Judge Perkinson, can you say that again, please? Were your claims exhausted in state court? Were your claims exhausted in state court? The Brady claims. Judge, those claims that are attached to the second amended petition have not been exhausted in state court, and so therefore that would be a schloop gateway manifest injustice. And the state did raise an argument about raising those in a different fashion in the DNA testing, and if you want me to address that, I can. But the new Brady evidence has not been brought before the state court. I am pursuing these matters right now in habeas under schloop manifest injustice and actual innocence. And so what are you looking for? In terms of remedy from this court, I would ask that either you grant the habeas petition and give Mr. Smith relief, or if you remand back to the district court that you remand with instruction that he allow me to conduct the discovery, have it be funded, and conduct an evidentiary hearing on this matter so that a true on the merits examination can be conducted. Thank you. Counsel? Thank you, ma'am. Please, the court. When all of the shiny, glittery stuff... Can you state your name? Yes, Lamon Anderson, Your Honor. I'm sorry. When all of the shiny, glittery and the hyperbole is stripped away from this case, really it boils down to one thing, and one thing only, and that's buyer's remorse. Smith is basically saying that he wants to trade in or get rid of his initial expert from the trial and have the new experts that he's found in habeas come in and present new evidence regarding his claim. And that doesn't constitute an ineffective assistance of counsel claim. I think it's important in this case, and I did pull it, to understand that trial counsel did not challenge the science, so to speak, the digital imaging, digital warping. I can't remember how they characterized it. That wasn't challenged. Well, there's quite an extensive Dalbert discussion. I think there's a procedural default issue, but there's quite an extensive Dalbert discussion at the time. There certainly is a procedural default, and it's the State's position that all of these claims are procedurally defaulted and untimely. But were you making the argument that there was not a Dalbert challenge? There was not. And I would refer the Court to page 1568 of the State's experts, and I'll quote it. Your Honor, my objection is under 403 as to confusion on this issue. And we would simply indicate to the Court that we stipulate that these computer programs have been in existence for a number of years to assist footprint examiners when a footprint is taken with a skewed angle. These computer programs have been in existence, that they work. They are recognized to correct for the skew of the camera angle to, in effect, make a better picture. We stipulate to that. The issue here was not the process through which the anomalies were discovered. The issue was the anomalies themselves. And even Fox agreed. There were two anomalies, as I understand the testimony. There was a nick, as it's referred to by both Mr. Fox and Mr. Greenway, and then there's some kind of another mark. It's a separation of some kind. And Fox agreed that there was a nick. He said, no, there's not this separation. I don't see it, even with the enhanced photographs or the enhanced imaging that was done by Greenway. And he said that. Now, Greenway didn't come in and say, this is the shoe that was found that matches the print in Mary's bedroom. In fact, he's very careful about that. He said there's some consistency. But. Well, counsel, even the district court judge allowed that he pretty much said it was a match. And there's no question the trial court said that the man was not qualified to offer that opinion. There's no question that the district court, the trial court said that. What he was qualified to render an opinion on, as he referred to it and as the trial court referred to it, was scientific visualization. He had, I think the district court said, utterly unqualified to be doing a shoe print match. As far as shoe print analysis, as I understand what Greenway was doing, and I'm going to admit that I don't understand the mathematical computations or the things that were discussed when he discussed the process through which he came by this. But what he was simply doing was almost akin to a lay opinion. He was looking simply at his enhanced photographs, saying, here's the separation anomaly. Here's the nick. And looking at the shoe and saying, I see those, too. A lay opinion cloaked as an expert. I'm not going to deny that I believe that he stepped over the bounds. I really, I can give that. But that isn't in effective assistance of counsel. And really, it doesn't matter in this case. Because Lanny Smith told, I believe it was Brian Ravenscroft, that's my shoe print up there. Now, that's not the exact quote. There were two different shoe prints. There was one in the dirt outside and one in the dust in the bedroom. And Brian didn't testify about which one. And that's, yes, that's true, Your Honor. That is true. But in addition to that, counsel takes, talks about Lanny's mental health. And I would simply refer the court, I think that's greatly minimized. I would refer the court to the supplemental excerpts of record, page 2215, where Smith's own expert says that Lanny's impairment, receptive language, is, quote, very mild. And then he goes on to state that Smith, quote, understands normal conversation when we talk with him. If we elevate the complexity of the language and use legalese and high-level abstract concepts, things like documents that might be given to him or read to him related to this current matter, he's going to have a more difficult, he's some difficult understanding the more difficult higher-level concepts. But then on page 2237, Dr. Korget also says, the only people that Smith may spontaneously say something to would be his friends. And Ravenscroft was one of his friends, admittedly. But forgive me for interrupting, but I'm trying to get to, but I don't think, I agree with what you just said, but Ravenscroft didn't testify about which footprint, right? Not the one in the dust or the one in the dirt. The exact quote is at the Downard's home. It doesn't, he doesn't say whether it's in or out. That's true. But Mr. Thompson testified in his deposition that based upon that testimony, and I quote, you had to be there. And he goes on to explain the way in which Ravenscroft gave that testimony is that it was extraordinarily compelling to the jury. It was extraordinarily compelling to Thompson. To the point that they really didn't cross-examine further on that, at all, on that particular area with Ravenscroft to determine whether in fact, I suppose, whether it was in or outside of the house. That is the only testimony that the jury asked to have reheard during deliberations. I would submit to the court that that is extremely important evidence in this case. Extremely important. Yes, Your Honor. Help me sort through this whole Brady burden at this point. Your Honor, as. There were a number of exhibits that were revealed after the remand that the petition is now highlighted as possibly being Brady and possibly being material. I'm just trying to figure out who has the burden, but it certainly affects the property report that came out that had some initial now with Detective Rodriguez, the additional prior bad acts of Mr. Jeff Smith, and then also the letter from Detective Rodriguez regarding Mr. Smith's statutory rape and what he thought of him, even though he testified, I think, quite the opposite at trial. And I think there may be one other document, but it seems like those are not insignificant. I'll let you talk about the materiality of them, but first, if you could tell me about the burden. I do want to talk about the suppression, and thank you, Your Honor. The problem that I have is that in our supplemental response brief, I specifically said, there's no evidence in this case establishing that trial counsel didn't have those documents. And even the affidavit of habeas counsel, there's nothing from trial counsel saying we didn't have this stuff. There's nothing in his deposition. But where have we ever said that that's required? No, so what's the authority? Where do we need that? What are you pointing to that tells us that we need the trial counsel? I don't know that you need some evidence that the state suppressed it. Well, I think Price is the case, isn't it? Your Honor, based upon my reading of Price and other cases, it is still the burden of the defendant in alleging a Brady claim to show that there is suppression. And I don't believe that that's been done in any way, shape, or form in this case. So I think Price says that you're right, that the burden starts with the defendant to come forward. But it specifically says to show or to raise an inference. And that really goes back to Judge Merguia's point, which is these issues were quite central. There's very thin physical evidence in this case. It's unique in that regard. There's very little physical evidence that ties these crimes to Lanny Smith. And the shoe print was a big deal at Chucknell, for sure. So was the defense position that Jeff was the most likely culprit, and hence the prior bad acts. It's hard to imagine that the defense counsel could have had any of the items that Judge Merguia just mentioned and wouldn't have used them at trial. Really tough to imagine that. So that's how I analyze it, and I just want to give you a chance to respond. Your Honor, I think you have to look at the cross-examination of Jeff Smith. Because trial counsel repeatedly questioned him about these various acts involving his ex-wife. Some of them, but not the new ones in the new Brady material. If your argument is that it's cumulative, I'll grant you, that's a different argument, though. But we're still back at the point of trying to figure out who's got the burden and were these really missing. And it seems to me that she's got a pretty strong argument that the defense counsel didn't have them. It was aggressive and vigorous cross-examination, and that's why I can't imagine that if they had had the records that are now, have been, now they say recently disclosed, that they wouldn't have hammered further, so to speak, with those documents. And it's not clear to me that they had them, but I don't know that they didn't have them for sure other than that. And I'm trying to figure out who's burdened. I wanted to give you your best shot as to tell you why they haven't met theirs or you've met yours. The problem that I have with that, Your Honor, is that the trial court shut them down on the additional impeachment evidence. And so we really don't know from this record exactly what else they had in the record. Except they had Exhibit AA that they had prepared, and it looks like a stack of prior bad acts by Jeff. I don't mean that it was really an inch thick, but it seems that they had everything all in one fell swoop. Why would they have excluded the others? I don't know that that is everything in its entirety. Well, can I ask you the obvious question, which is did the State produce a production log? Typically that would have been maintained, a production log to indicate what was produced. At the trial level? Uh-huh. Your Honor, I can't say that definitively. But what I can tell you based upon my review of the record, back in, this case was tried in 95 and actually 96, most prosecutors in Idaho had an open file rule. And I know that there are subsequently some issues with that, and most prosecutors have changed that. The problem that I have is that there is, I don't believe that there is a quote-unquote bait-stamp list of every document that was provided by the State to defense counsel. I don't believe that exists in the record. I think Mr. Moss explained during one of the motions to compel, and it may have even been during a motion in the limine, some of the material at least that had been produced, and that they had produced all that they had. Let's just assume then, just for now, again, I'm just assuming, because I want to hear your response. Let's say that they've established that they weren't disclosed previously, that they were suppressed. Next is prejudicial and materiality. Can you talk about that? Your Honor, I alluded to this earlier. As near as I can tell from the documents that counsel is now alleging were withheld, all it is is further impeachment evidence of Jeff. As I said, the trial court shut that down. There wasn't going to be any more. Let's talk then about the property report involving Detective Rodriguez. Let's just talk about Detective Rodriguez. The property report with the nine and a half scribbled in, and then also that additional record that was discovered regarding his different view at another time contrary to how he testified regarding Jeff Smith. If I recall correctly, Your Honor, I believe Detective Rodriguez during his trial testimony explained the discrepancy of the nine and a half because I think that came up. I'm trying to remember. I think that came up at the grand jury proceedings, and he actually testified differently during those grand jury proceedings than what he did at trial. Well, Jeff did. Are you talking about Jeff or Rodriguez? I thought it was Rodriguez also. They both did is my recollection. Well, there was a Detective Thompson, there's a Detective Rodriguez, and then Jeff. In terms of grand jury, I'm not quite sure who testified other than if you look at it in this light, and that's what we have to look at it in a certain light now with this evidence that was newly turned up by these alleged Brady documents, is we have Jeff testifying before the grand jury that initially he was an eight and a half, I think it was. And then when there was some question that the shoe was found was an eight and a half, he was brought back into the grand jury, I believe, and then he took the fifth. He was shown the shoes, I believe, and asked, which pair are your shoes, and he took the fifth and wouldn't answer the question. And Detective Rodriguez came back into the grand jury and said, I talked to him in the hall, and he said eight and a half, but he meant nine and a half. He's wearing eight and a half today. It's not a great record in terms of, well, it's not, right? It's pretty wobbly. So what are we to make of that, and what's your best take on it from your perspective and for your side? Your Honor, I still don't believe that it establishes a reasonable probability of a different result, and particularly when you factor in all of the other evidence that was established at trial. And, Your Honor, I recognize your concern that there wasn't a lot of forensic evidence establishing this, but there was certainly the ballistics testing. It was Lanny's rifle that was the murder weapon. His dad's rifle, right? No. And the testimony was that he had it that weekend? No, that was Lanny's rifle, and his dad kept it under lock and key for him. Okay. Irrespective, there's not any evidence that Jeff had that rifle anywhere near the time of the murders, whereas there are multiple witnesses that said they saw Lanny with the rifle, and quite frankly, the ballistics testimony is... And what is the ballistics testimony, that the bullets were .22 caliber, or they came from that gun? They came from that gun. The two experts agreed to that, and many of the bullets were quite damaged. But it's a troubling record. It's a troubling record. There's testimony that, in the past, Jeff had certainly a violent history. Lanny did not. Jeff had stolen the gun from Lanny, at least on one occasion. Not close in time, but that had happened certainly in the past. I think the district court order recognized that a serious, and maybe the defense strategy, was to argue that maybe it was that shoe, but whose foot was in it was the question. Who was there, and if it was indeed one of the two brothers, who pulled the trigger, right? Yes. Hence the concern about the chain of custody evidence, and whether it was an eight-and-a-half or a nine-and-a-half, and the change record is very concerning. Why isn't that a valid Brady claim that we should be concerned about? Well, as far as the chain of evidence, it wouldn't have excluded the evidence in Idaho, at least. I believe there are even Ninth Circuit cases, but in Idaho, it goes to weight, not admissibility. And so the evidence was coming in regardless. Right, and so on the Brady claim, I think this is really helpful for us. And so thank you for your patience. But if we just kind of walk back, and you have to do a bit of a mental exercise, you know, had they known what would have happened, and the question for us on Brady is whether or not it would have really raised a doubt. Does it undermine our confidence? Is there a question of whether the jury might have thought, gee, given the standards of beyond a reasonable doubt, can we really say who was there? What's your best response to that? Your Honor, as far as confidence in the outcome of the proceeding, I think I've gone through that. The ballistics testing, the statement to Ravenscroft, the individuals that saw him with the gun that night, the confession to James Swager. Okay, so the ballistics testimony doesn't help us to know who was wearing the shoes and pulling the trigger, right? Correct. So let's just walk through it. And then the second thing you said was what? The ballistics and then the? The confession to James Swager, the jailhouse informant. The jailhouse informant. Yes. Okay. Lanny lied about owning guns even. There was a change in his personality and his appearance. There was his reaction when he first learned of the Downards murder. As compared to Jeff's reaction, Lanny had virtually no reaction. Jeff was extremely upset. There was the fact that Lynn, the father, heard Lanny showering the night of the murders. And then I believe it was either later that night or shortly thereafter, he had the conversation with the Huffikers. And they noted, or at least Mr. Huffiker noted, that he had wet hair. What's wrong with wet hair? It all ties in with the fact that he was out and about that night. And when you couple that with the people that saw him with the rifle, and nobody saw Jeff with the rifle, he's the only one that had opportunity. Is there any place in the record where the altered police report with Detective Rodriguez's initials appeared? Was that used at trial anywhere? I'm sorry, Your Honor. I just don't remember. It is a voluminous record. I just don't recall. I see that my time is up. But if the Court has no other questions, we would ask that the district court be affirmed, or alternatively, if this Court believes that there has been a violation, that it be remanded to the district court because we have asserted procedural default and a statute of limitations problem, particularly with the Brady claim. May I ask one more question? Sure. Thank you for reminding me. If there's a concern here, we have case law, I think, that isn't just the Schlupp gateway on the due process claim. But as to Brady, we have a case called Gonzales v. Wong, and we have another case called Milk. Are you familiar with those cases? And if not, given the look on your face, I can give you a heads up. Gonzales sounds vaguely familiar. Okay. So let me just cut to the chase. There are case law at Ninth Circuit Authority that I think we would be bound to follow here, where if there is a Brady violation, if we were to find a Brady violation, it has not been presented to the state, because we have such strong authority indicating that these claims are to be routed and presented to the state first. That case that I just mentioned is a case in which the case was remanded. A Brady violation was found here in the Ninth Circuit. The case was remanded to the district court with directions to basically stay the case under Rhines, so that those claims could be exhausted in state court is one option. But it sounds like what you would be requesting, if we find a Brady violation, is that the case go back to the district court so the district court can rule on the procedural posture. Yes, Your Honor. I don't know how the district court cannot find the Brady claim is not double negatives. It is procedurally defaulted. And the problem with a Rhines stay in Idaho is that I'm not sure how this case is going to get back in front of an Idaho trial judge, because you just don't get that opportunity years after the fact. I suppose that there could be an argument made under our Uniform Post-Conviction Procedure Act, which is codified in Section 49, et cetera, that maybe it was a claim that couldn't have been known, but I'm not sure that would even apply in the context of a non-capital case. That's her argument, that she couldn't have known, she couldn't have exhausted, and under Gonzales, that the case has to be remanded if there's a Brady violation, that the case would need to go back to the state court for the claim to be presented there first, before any Federal court takes it. And I suppose they could attempt that, but I'm just not sure how successful it's going to be, because of the time that there is a provision under our Uniform Post-Conviction Procedure Act to complete DNA testing, even at this late date, because there's not a statute of limitations on that. But your position, in any event, is that even if we were to find a Brady claim that we ought to have, that the procedural default issue hasn't been adjudicated at the Federal level? It has not. In fact, Judge Lodge said that he wasn't going to deal with procedural default or the statute of limitations issue, because of the problems associated with those two concepts, particularly in the context of some of the other claims. Thank you, counsel. Thank you, Your Honor. Judge Parkerson, do you have any questions? I'm fine, thank you. It's a very good argument. Okay. Thank you. Did you have a few minutes left, I think? Is that it? Not quite. Go ahead. I do, Your Honor, want to confirm the excerpts of record, Volume 2, is what I was referring to in terms of that petition. And I want to talk a little bit about this potential remand issue to address the Brady. As a logistical matter, in order to get back there and address the procedural default, if the discovery and the funding issue isn't addressed, then I'm not going to be able to reach the hurdle on Shloop of manifest injustice because I won't have been able to develop it. So if you remand it back for that issue to be addressed, then I still need to walk through that gateway and fully develop the claims. The other thing that I think that the opposing counsel is referring to on exhausting at the state level is that this will be considered to be a second successive. So it's a successive petition for post-conviction, and so it has some pretty significant hurdles for the state court to address it. And it will also be an ancillary proceeding. I'm appointed as CJA counsel. Mr. Smith, who is a 69 IQ, will not have the ability to do that pro se, so I would be seeking an appointment from the court. If it's remanded to be able to assist him, should I proceed in front of the state? And I'm concerned because the district court below has denied funding at every turn. I don't know if he, without direction, would appoint me to do an ancillary proceeding on this absent some pretty specific instructions. Thank you both very much, Ms. Masseth and Mr. Anderson. I appreciate your presentation and your arguments here today on this kind of very interesting and challenging case. But you both did a very fine job. I appreciate it. We are adjourned. Thank you.
judges: Pregerson, Murguia, Christen